# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

----------------◆----------------

## KENT H. PAYNE, EXECUTOR OF THE ESTATE OF JORDAN KENT PAYNE, AND LESLIE PAYNE,

Appellants,

v.

## EYERLY-BALL COMMUNITY MENTAL HEALTH SERVICES and SCOTT THOMAS

Appellees.

----------------◆----------------

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF IOWA*
No. 4:21-CV-00349

----------------◆----------------

## APPELLANTS' REPLY BRIEF

----------------◆----------------

**Robert Rehkemper**
GOURLEY, REHKEMPER &
LINDHOLM PLC
440 Fairway Dr., Suite 210
West Des Moines, IA 50266
(515) 226-0500
rgrehkemper@grllaw.com

**Paul Statler**
STATLER LAW, P.L.L.C.
301 East Walnut St., Ste 7
Des Moines, Iowa  50309
(515) 288-0509
paul@statlerlaw.net

ATTORNEYS OF RECORD FOR APPELLANTS

i

# TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS...............................................................ii

TABLE OF AUTHORITIES.........................................................iv

ARGUMENT.....................................................................1

I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT EYERLY-BALL, A PROFESSIONAL MENTAL HEALTH PROVIDER, AND ITS EMPLOYEE, SCOTT THOMAS, DID NOT OWE A DUTY OF REASONABLE CARE TO PAYNE, AN INMATE AT MADISON COUNTY JAIL.........................1

    A.    General Response.................................................1

    B.    Preservation of Error..............................................4

    C.    Eyerly-Ball and Thomas owed Payne a duty of reasonable care based upon their undertaking to render services recognized as necessary for the protection of inmates at the Madison County Jail............................................9

        1.  Eyerly-Ball and Thomas' Affirmative Conduct Increased the Risk of Harm.................................10

        2.  Eyerly-Ball and Thomas Undertook to Perform a Duty Owed by the Another (Madison County Jail) to a Third Person (Payne)...................................................15

        3.  Madison County Jail Relied Upon Eyerly-Ball and Thomas' Undertaking of Providing Services to Inmates at Madison County Jail.......................................18

Appellate Case: 24-3238    Page: 2    Date Filed: 03/13/2025 Entry ID: 5495613

D. Relinquishing Physical Control of Payne Did Not Extinguish Eyerly-Ball or Thomas' Duty to Exercise Reasonable Care................................................................25

E. Eyerly-Ball and Thomas' Duties of Reasonable Care Also Arose Out of Their Special Relationship with Payne as Mental Health and Crisis Response Service Providers in a Custodial Setting...............................................29

CONCLUSION.............................................................33

CERTIFICATE OF FILING..........................................35

CERTIFICATE OF COMPLIANCE..................................36

CERTIFICATE OF SERVICE.......................................37

Appellate Case: 24-3238    Page: 3    Date Filed: 03/13/2025 Entry ID: 5495613

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Pages**

**Eight Circuit Appeals Court**

*Liebe v. Norton*, 157 F.3d 574 (8th Cir. 1998)....................................3

*Norwest Bank of N.D., N.A. v. Doth*, 159 F.3d 328 (8th Cir. 1998).........4

**Out-of Circuit Court of Appeals**

*Alston v. Town of Brookline*, 997 F.3d 23 (1st Cir. 2021)......................5

*McGowen v. Cooper Indus*, 863 F.2d 1266 (6th Cir. 1988)...................18

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010)...........................................................................8

*Templeton v. Jarmillo*, 28 F.4th 618 (5th Cir. 2022)............................5

*United States v. Rapone*, 131 F.3d 188 (D.C. Cir. 1997)..................8, 9

*Woodward v. Corr. Med. Servs. Of Ill., Inc.*, 368 F.3d 917 (7th Cir., 2004).............................................................................11

**United States District Courts**

*Foster v. Integrity Mut. Ins. Co.*, 2019 U.S. Dist. LEXIS 229749, 2019 WL 8301699 (S.D. Iowa) ...............................................................14

*Goff v. Harper*, 1997 WL 34715292; 1997 U.S. Dist. LEXIS 24186 (S.D. Iowa).......................................................................................3

*J.S.X v. Foxhoven*, 361 F.Supp.3d 822, 834 (S.D. Iowa, 2019)..............3

**Iowa Supreme Court**

*Cutler v. Klass Whicher & Mishne*, 473 N.W.2d 178 (Iowa 1991).......13

*Hill v. Jackson*...........................................................................6, 17

*Jain v. Iowa*, 617 N.W.2d 293 (Iowa 2000) ................................. 12, 13, 14

*McCormick v. Nikkel & Assoc.*, 819 N.W.2d 368 (Iowa 2012)..............26

*Morris v. Legends Fieldhouse Bar & Grill, LLC*, 958 N.W.2d 817 (Iowa 2021).................................................................................27

*Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104 (Iowa 2011).............................................................................................26

*Thompson v. Kaczinski, 774 N.W.2d 829, 834 (Iowa 2009)*.................33

iv

## Other State Appellate Courts

*Balla v. Idaho*, 595 F.Supp. 1558 (D.Idaho 1984)……………………………3

*Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 15 (Penn. 2019)…………….11

*Moats v. Preston County Commission, 521 S.E.2d 180, (W.Va. 1999)*………………………………………………………………29, 30, 31

*Morris v. Corder*, 866 S.E.2d 66 (W.Va. 2021) ………………28, 30, 31, 32

*Rogers v. Christina Sch. Dist.*, 73 A.3d 1 (Del. 2013)…………………..13

*Sankey v. Richenberger*, 456 N.W.2d 206 (1990)………………….21, 22

*Smith v. State*, 921 P.2d 632, 634-45 (Alaska 1996)…………………….4

*Tomfohr v. Mayo Foundation*, 450 N.W.2d 121 (Min., 1990)…………..25

## Restatement Sections

Restatement (Second) of Torts § 324…………………………………….18

Restatement (Second) of Torts 324A……………………………………7, 33

Restatement (Third) of Torts, § 40………………………………….13, 32

Restatement (Third) of Torts § 42…………………………………4, 10, 33

Restatement (Third) of Torts, § 43………………………………10, 17, 33

v

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN CONCLUDING THAT EYERLY-BALL, A PROFESSIONAL MENTAL HEALTH PROVIDER, AND ITS EMPLOYEE, SCOTT THOMAS, DID NOT OWE A DUTY OF REASONABLE CARE TO PAYNE, AN INMATE AT MADISON COUNTY JAIL.**

### A. General Response

A mental health service provider is paid $78,059.68 annually to provide services but claims they do not owe a duty of reasonable care to the vulnerable population they serve. (App. 157-59. Client Account Summary Report, Depo Exhibit 33). When confronted with the tragic results of their deficient provision of mental health services, Eyerly-Ball Community Mental Health Services (Eyerly Ball) and their employee, Scott Thomas' response is simply, "not our job, not our problem." "Not our job" is an attractive defense because after all, it is just another 'mentally ill, drug addicted criminal' who took his own life.

The insurmountable deficiency with Appellees' "not our job" defense is it ignores the materially disputed facts and legal principles which prevent their duty-ducking business plan from working. They attempt to self-servingly hyper-narrow the scope of the services in a

1

manner that's inconsistent with their contractual obligations, Thomas'
written job description, and their affirmative undertakings.

Eyerly-Ball and Thomas cannot avoid the fact they are in the
profession of providing mental health services. (App. 341, R.Doc. 99-3,
VanHorn Depo., p. 27, lines 6-8). In furtherance of their business and
profession, Eyerly-Ball contracted to be the "Provider" for CICS,
including providing mental health services in the Madison County Jail
("Jail"). (App. 118, R. Doc 99-3, CICS Agreement, EB27-34; App. 134,
R. Doc 99-3, Management Plan, p. EB81). Thomas was an employee of
Eyerly-Ball acting within the scope of his employment when he
assessed Payne at the Jail. (App. 165, R. Doc 98-3, Thomas Job
Description, p. EB3).

Thomas candidly informed the Iowa Department of Criminal
Investigation ("DCI"), prior to civil litigation lawyers being involved
that his job involved conducting mental health screening of inmates and
assessing them for their mental health needs. (App. 455-56, R.Doc 99-3,
Thomas Interview with DCI ("DCI"), p. 2, line 15 – p.3). Thomas' verbal
explanation is consistent with his written job description defining his
duties as including "determining physical and mental health and

2

substance abuse care needs of inmates," providing "direct client services until client is able to begin services with the referral source," and "assist with the development of client crisis plans." (App. 165, R.Doc 98-3, Thomas Job Description, p. EB3).

Throughout their brief, Eyerly-Ball and Thomas argue it was not their duty to prevent Payne's suicide. This is disheartening to hear from a business named "Eyerly-Ball Community *Mental Health Services*"! A fundamental component of providing mental health services is suicide prevention. It is well-established an inmate has a constitutional right to be protected from a known suicide risk. *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998). There are six components of minimally adequate mental health services, the sixth being "*a basic program for the identification, treatment and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program.*" (emphasis added) *Goff v. Harper*, 1997 WL 34715292; 1997 U.S. Dist. LEXIS 24186, *121 (S.D. Iowa); quoting *Balla v. Idaho*, 595 F.Supp. 1558 (D.Idaho 1984). *Goff* adopted and cited with approval in *J.S.X v. Foxhoven*, 361 F.Supp.3d 822, 834 (S.D. Iowa, 2019).

3

It logically follows that one cannot provide adequate mental health services without basic competency in suicide prevention. This is especially true when providing mental health services in an environment where suicide is the leading cause of death. Of all people, a professional mental health services provider should know this.

Eyerly-Ball and Thomas' argument that the scope of their undertaking was more limited than Plaintiffs contend, is one of scope—not existence of a duty. "When reasonable minds can differ about whether the risk or negligence as within the scope of the undertaking, it is a question of fact for the factfinder." *Restatement (Third) Of Torts*, § 42, cmt. g. "Where reasonable people could differ over the nature and extent of the act undertaken, summary judgment is inappropriate, since the scope of the assumed duty will vary depending on the inferences drawn from the facts." *Smith v. State*, 921 P.2d 632, 634-45 (Alaska 1996). Eyerly-Ball and Thomas are free to make their argument to a jury, but it was error for the district court to buy it as a matter of law.

## B. Preservation of Error.

In general, an appellate court will not consider arguments first raised on appeal. *Norwest Bank of N.D., N.A. v. Doth*, 159 F.3d 328,

Appellate Case: 24-3238     Page: 9     Date Filed: 03/13/2025 Entry ID: 5495613

334 (8th Cir. 1998). The court "may, however, consider an issue for the first time on appeal when the argument involves a purely legal issue in which no additional evidence or argument would affect the outcome of the case, or where manifest injustice might otherwise result." *Id.* While the exception to the general rule of error preservation fits this case, Appellants' arguments under this section were sufficiently preserved for appellate review and need not rely on the plain error exception.

The issues of whether Appellees owed Payne a duty to exercise reasonable care arising out of their contractual and voluntarily undertakings were squarely presented to the trial court. Preservation of an issue for appellate review "depends on whether the issue itself was presented face up and squarely in the trial court." *Alston v. Town of Brookline*, 997 F.3d 23, 44 (1st Cir. 2021) (failure to cite specific rule of evidence did not preclude appellate court from considering it when reviewing the district court's ruling on the issue). "Citing and analyzing the best discovered authority on the issue supports the presentation, but it is not the same thing as identifying the issue." *Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th Cir. 2022).

Appellate Case: 24-3238    Page: 10    Date Filed: 03/13/2025 Entry ID: 5495613

Brief Point I of Plaintiffs Brief in Resistance to Defendants Eyerly-Ball and Thomas' <u>Second</u> Motion for Summary Judgment, was "Scott Thomas owed a legal duty to Jordan Payne." (R.Doc.102, Plaintiffs' Brief in Resistance to Second Motion for Summary Judgment, p. 1). Subsection B was titled: "Thomas Voluntarily Undertook Performing a Service to Jordan and Therefore Owed Him a Duty of Reasonable Care." (*Id.* at 2). Brief Point III(B) was titled "Eyerly-Ball owed Jordan a Duty to Exercise Reasonable Care." (*Id.*).

While admittedly not specifically citing to Restatement (Second) § 324A, or Restatement (Third) of Torts § 43, in the district court, Plaintiffs clearly and repeatedly argued Thomas "voluntarily undertook performing a service to Jordan and therefore owed him a duty of reasonable care." (*Id.* at 20). Plaintiffs argued, "[i]n this situation, the privately contracted company and their employee assume the role and corresponding duty of the government entity." (*Id.* at 19). Plaintiffs also argued: "[a] party who assumes a duty under a contract for the safety of the public or certain individuals . . . owes a positive duty to the public or individual who benefits under the contract." (*Id.*).

6

Plaintiffs cited § 42 of the Restatement (Third) of Torts, previously § 323 of the Restatement (Second) of Torts, titled "Duty Based on Undertaking." (*Id.* at 20-21). The requirements of this Restatement section parallel those set forth in section 324A. *Restatement (Second) of Torts*, § 324A, cmt.a. Plaintiffs went into depth arguing how legal principles articulated in sections 42 and 323 imposed a duty upon Thomas to exercise reasonable care toward Payne. (*Id.* at 21-24). Plaintiffs similarly argued that Eyerly-Ball owed a duty to exercise reasonable care under the same Restatement provisions based upon their contractual undertaking and their provision of services to inmates of the Jail. (*Id.* at 38-41.)

With the argument of a duty imposed based upon undertaking squarely before it, the district court dedicated three pages of its ruling under the heading, "b. Voluntary Undertaking" to address and reject Plaintiffs' arguments that Thomas owed Payne a duty based upon his voluntary undertaking. (App. 091-93, R.Doc.108, Order on Defendants' Motion for Summary Judgment, pp. 11-13). The district court also considered and rejected the same arguments as it related to Eyerly-Ball, concluding "Eyerly-Ball did not owe a duty of care based on a

7

special relationship, voluntary undertaking, or conduct that created a risk to Jordan." (*Id.* at 16).

The issues now raised in this appeal were clearly and specifically raised and ruled upon by the district court. Plaintiffs now cite additional authority in support of their arguments. "Whether or not an issue is preserved in the trial court does not depend on what authorities the arguing party cites to that court." *Alston*, 997 F.3d at 44. "A litigant may cite new authority on appeal." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 773 n.20 (7th Cir. 2010): citing *United States v. Rapone*, 131 F.3d 188, 196 (D.C. Cir. 1997) (defendant's request was sufficient to qualify as a "demand" for a jury trial within the meaning of 42 U.S.C. § 2000h even though defendant's request was made as a constitutional argument and did not specifically invoke that code section). Even after an argument is submitted to the court for consideration, a litigant is free to bring additional authority to this court's attention pursuant to Fed.R.App.P. 28(j), prior to the court's opinion.

Here, just as was the case in *Rapone*, Plaintiffs are not raising issue for the first time on appeal. Rather, they offer additional legal

8

authority for the position they repeatedly advanced before the district court: Eyerly-Ball and Thomas owed Payne a duty to exercise reasonable care arising out of their voluntary and contractual undertakings. *Rapone*, 131 F.3d at 196. The issue was adequately raised before the district court.

### C. Eyerly-Ball and Thomas owed Payne a duty of reasonable care based upon their undertaking to render services recognized as necessary for the protection of inmates at the Madison County Jail.

Appellees attempt to characterize the services undertaken on behalf of the Jail as being a match-making service merely connecting inmates with mental health service providers. Unfortunately for them, the written provisions of their own contractual obligations, their own affirmative undertakings and Thomas' written job descriptions contradict their claim. Plaintiffs have already set forth the facts confirming this undertaking and will not do it again here. (Appellants' Initial Brief pp. 21-35).

There is a reason that Appellees do not cite to any specific provisions of the CICS Agreement or the Management Plan in their Brief. (App. 111-13, R.Doc. 99-3, CICS Provider and Program Participation Agreement "CICS Agreement", pp. EB27-EB29; App. 126, R.Doc 99-3,

9

CICS FY2020 Management Plan ("Management Plan")). The plain language of their contractual obligations defeats their arguments. Instead of addressing the contractual provisions and sworn testimony of Thomas and his supervisor Van Horn, Appellees attempt to shift the focus by citing caselaw having no application to the case at bar. Those authorities will be easily distinguished below.

1. **Eyerly-Ball and Thomas' Affirmative Conduct Increased the Risk of Harm.**

An actor may be said to increase the risk of harm "because the plaintiff or another relied on the actor's performing the undertaking in a nonnegligent manner and declined to pursue an alternative means for protection." *Restatement (Third) of Torts*, § 42, cmt. f.; see also § 43, cmt. c (explaining sections 42 and 43 parallel one another, and comment d, referencing back to § 42, cmt. f.). While also a basis for imposing a duty of reasonable care under subsection 43(c), it does not change the fact that reliance upon a defendant's undertaking may also increase the risk of harm. *Id.*

Eyerly-Ball engaged in the affirmative conduct of dispatching an unqualified individual in response to Payne's mental health crisis. It is

10

common sense that sending an unqualified individual to address a mental health emergency increases the risk of harm to the individual suffering the crisis. It would be the same as providing an unqualified athletic trainer to assess an injured athlete. See *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 15 (Penn. 2019) (Providing unqualified athletic trainers qualified as affirmative conduct that increased risk of harm to student athletes). Also, if a jail medical provider's failure to train staff in competent suicide prevention measures can meet the higher constitutional duty standard of deliberate indifference under the Eighth Amendment, see *Woodward v. Corr. Med. Servs. Of Ill., Inc.*, 368 F.3d 917 (7th Cir., 2004), it can certainly qualify as increasing the risk of harm under the lesser negligence standard.

Thomas himself also engaged in affirmative conduct that increased the risk of harm to Payne. Thomas admitted he relayed to Jail staff that Payne informed him "that he wasn't going to harm himself." (App. 321, R.Doc.98-3, Thomas Depo. p. 77; lines 8-9). Thomas withheld the other, highly relevant information provided by Payne which would have undermined such a conclusion. (App. 321-322; R. Doc 99-3, Thomas Depo., pp. 77; line 10 – 78; line 19). Thomas' own communication left

11

Weakland satisfied that Payne would not harm himself. Weakland explained: "I do not remember the specifics of the conversation, but I do remember after we spoke that there was not any concern. I did not feel any extra concern for Jordan Payne." (App. 410, R.Doc.99-3, Weakland Depo., p. 34; lines 19-23). Assuming everything to be fine based upon Thomas' assertions, no additional precautions or observations were made of Payne, thereby increasing the risk of harm. (App. 405-406, R. Doc 99-3, Weakland Depo., pp 27-28; lines 24-03, 34).

Appellees cling desperately to the Iowa Supreme Court's ruling in *Jain v. State* which concluded the University of Iowa did not owe a duty to notify student's parents about the student's previously communicated suicidal ideations. *Jain*, 617 N.W.2d 293. Importantly, the decedent, Sonjay Jain, was not in the control or care of any other person at the time he committed suicide. *Id.* at 296. Jain was alone in his dorm room when he committed suicide. *Id.* There was no custodian that could be warned or notified in a manner that could prevent or intervene his suicide attempt. *Id.*

As already explained in Division I(c) and I(f) of Plaintiffs' initial brief, the fact that Payne was confined in a custodial setting

12

dramatically alters the scope and extent of the duty analysis and further distinguishes this case from *Jain*. See *Restatement (Third) of Torts*, § 40(b)(7); see also *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 182 (Iowa 1991). Also, the defendant in *Jain* was the University of Iowa, an educational institution, not a mental health provider. Additionally, *Jain* did not involve a defendant who voluntarily undertook to provide mental health services, including crisis response to the decedent who was in custody. Here, in stark contrast to *Jain*, had the professional mental health service provider defendants done their job competently, all they needed to do was notify Payne's custodian of the imminent risk of harm, who would then be able to protect Payne from self-harm. (App. 388, R. Doc 99-3, Barnes Depo., p. 106, lines 14-24). That option was not available in *Jain*.

Similarly, Appellees cite *Rogers v. Christina Sch. Dist.*, 73 A.3d 1 (Del. 2013), a case involving a student who harmed himself at home, not while at school. *Id.* at 5. The Court made it a point to explain one of the crucial facts guiding its denial of a duty to prevent the student's suicide was the fact the injury occurred *off* school grounds. *Id.* at 9. The Delaware Supreme Court explained: "Section 323 only addresses the

13

duty of care to a person physically present on the property of the entity owing the duty." *Id.* Additionally, just like *Jain*, the school had not undertaken to perform professional services specifically designed to decrease the risk of harm to the student. *Id.* at 10. Instead, in both cases, the defendants offered support and services that were not accepted by the individuals who ultimately committed suicide long after returning to their residences. *Id.*

Finally, Appellees' attempted reliance on the Iowa District Court decision of *Foster v. Integrity Mut. Ins. Co.*, 2019 U.S. Dist. LEXIS 229749, 2019 WL 8301699, (S.D. Iowa) is also misplaced. In *Foster*, the defendant provided insurance coverage to a company employing a cab driver who injured the Plaintiff while driving his cab intoxicated. It does not require much thought to conclude as the district court did in *Foster,* providing insurance coverage is not the undertaking to render services to another for the reduction of risk of physical harm a third person is exposed to. *Id.* at *3.

More specifically in *Foster*, the defendant insurance company performed its due-diligence, and it was undisputed that the drunk cab driver did not show any restrictions or drunk driving convictions on his

14

Motor Vehicle Records. *Id.* The cab company employer itself confirmed they too had performed a criminal background check prior to hiring the driver which revealed no relevant history. *Id.* It was later discovered the driver had a prior conviction for drunk driving which did not appear on his Motor Vehicle Record. *Id.* at *4. The district court reasonably concluded that providing insurance for a company employing the tortious driver did not create a duty to protect patrons of the cab service from harm. *Id.* at 5.

These cases relied upon by Eyerly-Ball and Thomas are a far cry from a mental health service provider who specifically responded to a custodial inmate's mental health crisis and failed to communicate and warn the inmates custodian of the obvious, imminent risk. Both Eyerly-Ball and Thomas owed Payne a duty because their conduct increased the risk of harm to Payne.

2. **Eyerly-Ball and Thomas Undertook to Perform a Duty Owed by Another (Madison County Jail) to a Third Person (Payne).**

Eyerly-Ball and Thomas attempt to characterize their undertaking as ensuring "inmates have access to medical treatment for mental health while in jail and after, as a means to reduce recidivism."

15

(Appellees Brief, p. 33). However, Eyerly-Ball and Thomas were contracted to provide mental health services—including crisis response services to inmates at the Jail. This is more than a bare assertion and is supported in the plain language of the contractual agreements as well as Eyerly-Ball and Thomas' own admissions under oath thoroughly laid out in Plaintiffs' initial brief. (Appellants' Initial Brief, pp. 21-35).

Just as in the preceding division, Appellees continue to rely upon misplaced, tangential caselaw. Citing *Hill v. Jackson*, 783 S.E.2d 719 (Ga. Ct. App. 2016), for the proposition that the contracted medical provider did not owe the inmate a duty to prevent his suicide, again strains the facts from Plaintiffs'. (Brief of Appellee, p. 39). The critical distinguishing fact between this case and *Hill* is, in *Hill*, the medical provider, CMA, did not have direct contact or interaction with the inmate while he was present in the facility they served, the Fulton County Jail. *Id.* at 724. The inmate was housed in a neighboring county facility. *Id.* There was also no evidence "that any agent of CMA was aware of Hill's presence at the Fulton County jail on the date in question." *Id.* Just as important, the Georgia court concluded the medical providers contractual agreement specifically excluded providing

16

services to inmates who were housed in a different facility as Hill had been. *Id.* at 731.

The facts of *Hill* are vastly different from the facts before this Court. Here, Eyerly-Ball was the contracted mental health provider for the jail confining Payne. Thomas, an employee of Eyerly-Ball, was specifically requested to respond to the Jail in direct response to Payne's mental health crisis. (App. 456, R.Doc. 99-3, Thomas June 12, 2020, Interview, p. 4, lines 5-10). Thomas responded and spent almost thirty minutes personally evaluating and assessing Payne in a privileged environment. (App. 104C, R. Doc 99-3, Multi-Purpose Video).

After receiving information that would put anyone on notice that Payne was an elevated suicide risk, Thomas informed those exercising custody over Payne of a single, select, and misleading piece of information: Payne would not hurt himself while in custody. Unlike in *Hill*, Eyerly-Ball and Thomas specifically undertook to provide Payne with mental health and crisis response services and as such, their duty of reasonable care was triggered pursuant to Restatement (Third) of Torts, § 43(b). This is not a situation as in *Hill* where the provider did

17

not interact with the inmate because the inmate was housed in a different facility and jurisdiction.

3. **Madison County Jail also relied upon Eyerly-Ball and Thomas' undertaking of providing services to inmates at Madison County Jail.**

Reliance under this subsection may be established by testimony from the entity on whose behalf the services were being rendered. *McGowen v. Cooper Indus*, 863 F.2d 1266, 1272 (6th Cir. 1988); *Restatement (Second) of Torts* § 324(c), cmt e. Evidence of routine practices and industry expectations of parties may also be relevant in establishing reliance. *Id.*

The evidence establishing Madison County's reliance on Eyerly-Ball and Thomas' competent provision of mental health services to inmates at the Jail is overwhelming. When Jail Administrator Niblo was asked what services Eyerly-Ball would provide when he would call, Niblo answered: "They'll provide mental health services." (App. 420, R.Doc., 99-3, Niblo Depo., p. 43, line 25). Barnes similarly testified: "My -- it was my understanding they [Eyerly-Ball] were going to help inmates who were having mental health crisis." (App.381, R. Doc 99-3, Barnes Depo, p. 98, lines 9-11). When asked how that communication

18

would take place, Barnes responded: "They would keep us informed. They would let us know." (App. 381, R.Doc, 99-3, Barnes Depo., p. 98, lines 14-15).

Barnes answered "yes" when asked "[a]nd so if they said, 'based upon our standards, based upon our professional recommendations, this needed to be done for the betterment' - - or 'for the mental health of the inmate,' you would follow those instructions? (App. 382, R.Doc., 99-3, Barnes Depo., p. 101, lines 3-14). Barnes also admitted that common sense would dictate an increase in personal supervision of Payne if they were notified Payne was hearing voices that were telling him to do things to himself. (App. 385, R.Doc., 99-3, Barnes Depo., p. 103, lines 6-15)

When Barnes was asked if he believed Thomas would be in a position to evaluate or at least make a preliminary assessment of an inmate's mental health conditions and suicide risk, he responded: "yes." (App. 386, R.Doc., 99-3, Barnes Depo., p. 1041, lines 11-17). Barnes' expectation after Thomas met with Payne in particular was "[t]hat there would be open communication and - - on what's going on, what we

19

need to do next." (App. 387, R.Doc., 99-3, Barnes Depo., p. 105, lines 13-14).  Specifically:

> Q. In other words, if he [Thomas] identified concerning behaviors or concerning statements, especially those that may elevate -- or be considered elevated risk factors for Mr. Payne, would you expect those to be communicated to you and your jail staff?
>
> A. Yes.

(App. 387, R.Doc., 99-3, Barnes Depo., p. 105, lines 15-23). Barnes agreed such communication was part of their agreement with Eyerly-Ball.  (App. 387-88, R.Doc., 99-3, Barnes Depo., p. 105-06, lines 24-04).

Barnes further testified:

> Q. If they identified somebody as an elevated risk, especially for something like suicide, would you expect them to share that information with you?
>
> A. Yes.

(App. 388, R.Doc., 99-3, Barnes Depo., p. 106, lines 14-20).  Barnes agreed it is hard to act upon information he was not privy to.  (App. 389, R.Doc., 99-3, Barnes Depo., p. 107, line 3).

According to Barnes, had Madison County been notified of Payne's elevated suicidal risk, [w]e'd put them in -- put them under direct observation, put them in the front holding cell where we have close --

20

with them.  Take away anything they can hurt themselves with.  Put them in a suicide smock, stuff like that."  (App. 390, R.Doc., 99-3, Barnes Depo., p. 108, lines 2-9).  Instead, Thomas never suggested Madison County keep a closer eye on Payne but worse, he communicated there were no concerns for Payne's safety.  (App. 410, R.Doc., 99-3, Weakland Depo., p. 34, lines 19-23).  As such, no precautions were undertaken to reduce the risk of harm based upon Madison County's reliance on Eyerly-Ball and Thomas.

Yet again, this case is considerably distinct and different than the caselaw cited by Appellees, *Sankey v. Richenberger*, 456 N.W.2d 206 (Iowa, 1990). (Appellees' Brief, pp. 41-42). In *Sankey,* Plaintiffs sued the sheriff claiming he owed a duty to protect them against a gunman at the city council meeting. *Id.* at 209.  However, the sheriff was not present at the meeting in a security capacity, but as an administrative department head. *Id.* The court noted the authority that "no jurisdiction recognizes liability of government or its law enforcement officers for failure to prevent crime absent a special relationship between the police and the victim." *Id.* at 209.

Appellate Case: 24-3238     Page: 26     Date Filed: 03/13/2025 Entry ID: 5495613

As the *Sankey* court noted, existence of a duty at that time must be premised on the foreseeability of harm to the injured person; and the underlying record in *Sankey* was devoid of any evidence the individual's violence was foreseeable. *Id.* at 210. Finally, the plaintiffs in *Sankey* conceded they relied on the sheriff for administrative input at the meetings, not security. *Id.* As such, the court's conclusion the sheriff did not owe a duty to protect against an unforeseeable shooting at such meeting makes perfect sense.

Here, the opposite is true. Madison County Jail relied upon Appellees to address the mental health needs of their inmates. The most important part of this protection is appropriate communication between the mental health service providers and jail staff because as Barnes recognized, one cannot protect against a risk that is not communicated to him. (App. 389, R.Doc., 99-3, Barnes Depo., p. 107, line 3). While counsel for Appellees attempt to ignore the importance of this duty to communicate, Thomas himself conceded such communication was part of his job. The precise testimony was as follows:

> Q. I'm saying you meet with somebody - -

22

A. Yes.

Q. - - and they're checking all the boxes - -

A. Yes.

Q. - - on risk factors - -

A. Yes.

Q. - - for suicide.

A. Yes.

Q. What do you do? What do you share with Madison County?

A. Just what you just said.

Q. They check - -

A. "They're checking all the boxes. This is what's going on. This person is saying this, this, this, and this."

Q. *And do you believe - - would it be important to fulfill your job obligations with Eyerly Ball for you to communicate that information to Madison County?*

A. *Yes.*

Q. *It would be imperative, in fact, consistent with what you are hired and paid to do to forward that information on to the jail, who's ultimately in control of that person's supervision?*

A. *Yes.*

23

> Q. You're not going to, obviously, tell the jail what needs to happen or what they need to do, but you're going to - - it's important for you to provide them with the information necessary to guide their decision-making with what they have to do; correct?
>
> A. Yes.
>
> . . . .
>
> **Q. Because if communication is not adequately made about various concerns, it's hard to take action that could prevent a tragedy. Would you agree?**
>
> **A. Yes. If I - - if there are concerns, then I need to let the jail know.**

(emphasis added) (App. 305-08, R.Doc.99-3, Thomas Depo., page 48, line 12 – Page 50, line 18). Thomas went on to admit that not communicating effectively with the Jail about concerns he identified with an inmate would be a failure to fulfill his job obligations. (App. 308, R.Doc.99-3, Thomas Depo., page 50, line 24 – page 51, line 9).

Thomas' direct supervisor, Van Horn concurred in Thomas' duty to effectively communicate. Her precise testimony was:

> Q. If an individual identifies thoughts of self-harm during an interview with, for example, Scott - -
>
> A. Yeah.
>
> Q. - - would it be important for Scott to follow up on that?

24

A. Yes.  And Scott does **then relay that information to the jail.**
(emphasis added) (App. 346, R.Doc.99-3, Van Horn Depo., page 32, lines 9 - 16).

To quote Cool Hand Luke, "What we have here is a failure to communicate."  Simply put.  A failure to communicate is a failure to prevent suicide, which is a failure to provide competent mental health treatment.  The district court erred in concluding as a matter of law that no such duty existed.

### D. Relinquishing Physical Control of Payne Did Not Extinguish Eyerly-Ball or Thomas' Duty to Exercise Reasonable Care.

Appellees rely upon the district court's erroneous conclusion that Appellees did not owe Payne a duty of care, and therefore their negligence was immaterial. This tenuous position cannot be sustained. Firstly, the lack of actual custody over Payne at the time he committed suicide does not relieve Appellees of their duty to exercise reasonable care while performing their services. The Minnesota Supreme Court's explanation in *Tomfohr v. Mayo Foundation*, which was approved in the Iowa Supreme Court, is insightful on this point: "when the actions taken by the patient as a result of the mental illness are the very acts which the

25

medical provider had a duty to prevent, the provider's own failure to prevent the suicide should not create its own defense." 450 N.W.2d 121, 125 (Min., 1990); cited with approval in *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 120 (Iowa 2011).

While in his presence, Thomas owed Payne a duty of care to assist in preventing Payne from harming himself. In his presence, Payne presented Thomas with risk factors which would lead any reasonably competent mental health care professional to believe Payne was at high risk of suicide. As mental health services providers, Appellees owed Payne a duty of care to the extent that they inform those who also must identify risks and take measures to improve Payne's safety. Thomas' failure to relay that information to Jail staff renders Appellees negligent. Because Thomas had the ability to manage or mitigate a risk of harm during this critical time, Thomas' legal duty to do so remained even after his control was relinquished. *See McCormick v. Nikkel & Assoc.,* 819 N.W.2d 368, 371 (Iowa 2012).

The parties do not dispute Thomas "informs the jail of what the inmate has expressed to him." Appellee Brief at 49 (citation omitted). In this case, Thomas did *not* inform the Jail of Payne's risk factors. Given

26

these undisputed positions, Appellees cannot also claim "Thomas and Eyerly Ball should be relieved from liability because they *lacked the control* to be able *to do anything* to *mitigate* the harm". Appellee Brief at 50 (emphasis added). Only Thomas had the ability to inform the Jail that Payne had expressed risk factors of suicide.

Appellees cite to *Morris v. Legends Fieldhouse Bar & Grill, LLC* for the proposition that a defendant has no duty when the plaintiff was no longer under the defendant's control after the defendant (strip club which allows patrons to bring/consume alcohol) ejected the plaintiff who was subsequently struck by an automobile operated by another intoxicated individual. Appellee Brief at 50 (citing 958 N.W.2d 817 (Iowa 2021)). This analogy would almost make sense if Plaintiffs were alleging Payne told Thomas "I think I'll stab myself to death"; Thomas suggested removing sharp objects from Payne's cell; Payne escaped from the jail; and Payne was killed by another escapee. In *Morris*, the defendants had zero control over the intoxicated driver which killed the patron ½ mile from the defendant's premises. 958 N.W.2d at 820. Here, Thomas had the unfettered ability to "inform the jail of what Payne expressed to him", which was positioned to take precautions *based upon* Thomas'

27

information. (*See* App. 409-10, R.Doc.99-3, Weakland Depo., Page 33, line 12 – Page 34, line 7).

Cases specifically applying section 324A emphasize the importance of a defendant's failure to exercise reasonable care in the mitigation or elimination of the dangerous condition, despite the defendant's lack of immediate control over the injured plaintiff. In *Thompson v. Bohlken*, the plaintiff's theory was the defendant was negligent in its safety inspections which preceded the accident giving rise to the plaintiff's claim. 312 N.W.2d 501, 506 (Iowa 1981). The Iowa Supreme Court remanded for a new trial, concluding the issues of whether the plaintiff's harm was suffered because of his employer's reliance upon the defendant's inspections and whether the injury resulted from such reliance were for the jury to decide. *Id.* at 509.

In this case, a factual dispute exists as to what simple measures Thomas should have taken to prevent, manage, or mitigate the harm to Payne during the critical timeframe. Physical control is not required when the duty to identify and disclose harmful conditions exists and the failure to disclose such information to others ultimately results in an injury or death. *See Morris v. Corder*, 866 S.E.2d 66, 69 (W.Va. 2021)

28

(citing *Moats v. Preston County Commission*, 521 S.E.2d 180, 182 (W.Va. 1999)). Appellees owed Payne a duty of reasonable care arising out of their undertaking to perform services they recognized were for the safety of third persons.

### E. Eyerly-Ball and Thomas' Duties of Reasonable Care Also Arose Out of Their Special Relationship with Payne as Mental Health and Crisis Response Service Providers in a Custodial Setting.

Based upon Appellees' brief, Thomas and Payne had *no* relationship whatsoever. That cannot be true. Otherwise, Thomas' assessment of Payne and subsequent conduct relating to arranging additional services for Payne would be accomplished by Jail staff, not Thomas.

Further, if one were to adopt such position, then Thomas' own testimony would appear to the contrary:

> Q. Sheriff's office calls you and says, "Joe is trying to hang himself repeatedly. Can you come down and help?" would you say, "That's out of my league. That's over my head," or what would you do?
>
> A. I would go and -- if they asked me to come and meet with that inmate at the jail, I would go there.
>
> Q. And what would you do upon arrival, and how would you address that individual? How would you work with that individual?

29

A. I would meet with them, if they were willing to meet with me, and I would begin to explore the issues regarding the -- you know, what was going on with them.

(App. 304, R.Doc.99-3, Thomas Depo., page 46, line 9–22). Appellees' assertion, "Thomas is not a mental health professional who engages in evaluating and treating inmates' mental health issues[;] Thomas is not a licensed mental health professional … and has no professional expertise in detecting mental illness or evaluating suicide risk" does not align with Thomas' own testimony. (Appellees' Brief at 53) (citation omitted).

Appellees equate Plaintiffs' citation to *Morris* to the proposition that for a special relationship to exist between Payne and Thomas, the latter must fall within a definition of "mental health professional". (Appellees' Brief at 52-53). But in relying upon its own precedent, *Morris* repeated its findings in *Moats*:

Importantly, however, the foregoing discussion from *Moats* is merely dicta. In answering the certified question, the *Moats* Court held as follows in a properly issued syllabus point:

Recovery for wrongful death by suicide may be possible where the defendant had a duty to prevent the suicide from occurring. In order to recover, the plaintiff must show the existence of *some relationship* between the defendant(s) and the decedent giving rise to a duty to prevent the decedent from committing suicide. *Generally*, such

30

> relationship exists if one of the parties, <u>knowing the other is suicidal</u>, is placed in the superior position of *caretaker* of the other who depends upon that caretaker either entirely <u>or with respect to a particular matter</u>.
>
> Notably absent from the Court's syllabus point is any reference to a "custodial" relationship, be it as a caretaker <u>or otherwise</u>. Rather, the syllabus point expressly requires only "*some* relationship" which would give rise to <u>a duty to prevent suicide</u>. Further, the syllabus point's elaboration on the type of "caretak[ing]" which would exemplify such relationship certainly <u>does not preclude non-custodial</u> "caretaker[s]"; rather it describes somewhat broadly the *degree* of caretaking required, <u>without reference to the setting or construct</u>.

866 S.E.2d at 69 (quoting *Moats*, 521 S.E.2d at 182, syl. pt. 6) (emphasis to original added in *Morris*) (<u>emphasis added herein</u>). By the very nature of Thomas' personal interaction with and role in obtaining services for Payne, Thomas had *some* relationship with Payne involving *some* degree of caretaking.

Appellees attempt to limit the scope of duty in *Morris* to prevent suicide to "persons or institutions such as **mental hospitals**, **psychiatrists** and **other mental-health trained professionals**, deemed to have a special training . . . and which have the power or control necessary to prevent that suicide." (Appellees' Brief at 52-53) (emphasis in original) (citation omitted). Appellees selectively misconstrue *Morris'* holdings.

31

First, *Morris* noted "there is no reference to 'custody' contained within the description of this category of defendant." 866 S.E.2d at 70. The extent of Thomas' power or control necessary to prevent Payne's suicide does not exempt Thomas from *some relationship* to Payne giving rise to a duty to prevent Payne from committing suicide.

Second, *Morris* highlighted as significant that,

. . . [T]he original language of the syllabus point appears aimed at broadly synthesizing these two categories of duty-based suicide claims, while allowing for additional unspecified scenarios which fulfill the relationship criterion and thereby justify an imposition of a duty. The syllabus point draws its focus to the degree of the caretaking relationship and the caretaker's knowledge that the individual is "suicidal" for purposes of imposition of duty. Accordingly, the syllabus point is crafted to be applicable to a broad range of scenarios both fairly encompassing those specifically described in *McLaughlin,* as well as those that fall outside of its contemplation but nonetheless factually give rise to an actionable duty.

*Id.*

Under *Morris* and the *Restatement (Third) of the Law, Torts § 40*, Thomas had a duty to warn those who would resume custody and control over Payne.

The district court's rejection of this argument was premised upon Thomas not having nor maintaining physical custody of Payne. (App.

32

091; R.Doc 108, p. 11).  The district court's conclusion is contrary to the previously briefed Restatement principles.  *Restatement (Second) of Torts* 324A(b) and *Restatement (Third)* § 43(b).  Lack of physical control over Payne does not change the fact Appellees owed Payne a duty to the performance of the undertaking they agreed to conduct.

## CONCLUSION

Eyerly-Ball and Scott Thomas's duty can be found in any of the specific Restatement principles set forth above, a combination of those Restatement principles, the common law, or a conglomeration of all of the above.  This is not a situation where a principle or strong policy consideration justifies exempting this class of defendants from the exercise of reasonable care.  See *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009).  All legal principles and policy considerations weigh strongly in favor of the imposition of a duty in this case and the district court erred in concluding otherwise.

Respectfully Submitted,

GOURLEY, REHKEMPER,
& LINDHOLM, P.L.C.

By: /s/ *Robert Rehkemper*
Robert G. Rehkemper,  AT0006553

33

Paul J. Statler, AT0012577
ATTORNEYS FOR APPELLANT

34

## CERTIFICATE OF FILING

I certify that I filed this brief electronically through the Eighth Circuit Court of Appeals CM/ECF filing system on the 13th day of March, 2025.

I further certify that I served the attorneys of record for Appellees at 699 Walnut Street, Suite 1700, Des Moines, IA 50309, via the eighth Circuit Court of Appeals CM/ECF filing system on the 13th day of March 2025.

/s/ *Robert Rehkemper*
Robert G. Rehkemper,  AT0006553
440 Fairway, Suite 210
West Des Moines, IA 50266
Telephone No. (515) 226-0500
Email: rgrehkemper@grllaw.com
ATTORNEY FOR APPELLANT

Appellate Case: 24-3238    Page: 40    Date Filed: 03/13/2025 Entry ID: 5495613

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of the Federal Rule of Appellate Procedure 32(a)(7) because the brief contains 6,467 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in Century, 14-point font.

This brief has been scanned for viruses and is virus-free.

/s/ *Robert Rehkemper*
Robert G. Rehkemper,  AT0006553
440 Fairway, Suite 210
West Des Moines, IA 50266
Telephone No. (515) 226-0500
Email: rgrehkemper@grllaw.com
ATTORNEY FOR APPELLANT

36

## CERTIFICATE OF SERVICE

I certify that I filed this brief electronically through the Eighth Circuit Court of Appeals CM/ECF filing system on the 13th day of March, 2025; and further certify that on March 14, 2025 I will have sent ten (10) copies via certified mail to the 8th Circuit Clerk of Court at the following address:

Thomas F. Eagleton Courthouse, 111 South 10th Street, Room 24.329, St. Louis, MO. 63102.

I further certify that I served the attorneys of record for Appellees at 699 Walnut Street, Suite 1700, Des Moines, IA 50309, via electronic mail on the 13th day of March 2025.

/s/ *Robert Rehkemper*
Robert G. Rehkemper,  AT0006553
440 Fairway, Suite 210
West Des Moines, IA 50266
Telephone No. (515) 226-0500
Email: rgrehkemper@grllaw.com
ATTORNEY FOR APPELLANT

Appellate Case: 24-3238     Page: 42     Date Filed: 03/13/2025 Entry ID: 5495613